UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

STEVEN HARRIS and GARRY CAMPBELL,

                Plaintiffs,

        v.

BLUERAY TECHNOLOGIES
SHAREHOLDERS, INC., et al.,

                Defendants.

No. CV-07-342-FVS

ORDER DISMISSING FEDERAL
CLAIM AND REMANDING STATE
CLAIMS TO STATE COURT

**THIS MATTER** comes before the Court based, in part, upon the defendants' motion for summary judgment on the issue of standing.  The defendants are represented by Stephen Schneider; the plaintiffs by Jeffry K. Finer.

    **BACKGROUND**

During the nineteen nineties, Otis Associates Limited Partnership ("OALP") purchased a building in Spokane, Washington, known as the "Commercial Building."  Part of the building was divided into apartments.  OALP decided to participate in the Section 8 housing program.  *See* 42 U.S.C. § 1437f.  "'Section 8' refers to Section 8 of the United States Housing Act of 1937, which was added by the Housing and Community Development Act of 1974, Pub.L. No. 93-383, § 201(a), 88 Stat. 633, 662-66 (codified as amended at 42 U.S.C. § 1437f)." *Feemster v. BSA Limited Partnership*, 548 F.3d 1063, 1064 n.1

ORDER - 1

(D.C.Cir.2008).  OALP entered into a housing assistance payments contract ("HAP contract") with the Spokane Housing Authority ("the SHA").  In essence, OALP agreed to lease apartments in the Commercial Building to homeless persons in exchange for assistance payments from the SHA.  The assistance payments were funded by the Department of Housing and Urban Development ("HUD").[1]  Each year for many years, OALP and the SHA renewed their HAP contract.

The persons who lived in the Commercial Building typically suffered from both medical and psychological problems.  The president of OALP, Jim Delegans, established programs to meet some of their needs.  For example, he arranged for a nurse to visit them.  This was not the only reason why the tenants valued living in the Commercial Building.  Another was its location.  Tenants had ready access to public transportation, upon which many of them depended.

As it turned out, the Commercial Building was not a profitable investment for OALP.  During 2006, OALP defaulted on a debt to a creditor.  The debt was secured by a deed of trust on the Commercial Building.  The creditor commenced non-judicial foreclosure proceedings under the State of Washington's Deeds of Trust Act, chapter 61.24 RCW.  In due course, the trustee scheduled a trustee's sale.

The 2006-2007 HAP contract was set to expire on March 31, 2007.  Despite the fact the Commercial Building was the subject of non-

---

[1]At the Court's request, the parties have submitted a document that is entitled "Joint Stipulated and Disputed Facts."  It mentions assistance payments, but does not indicate whether OALP received other financial incentives for participating in the Section 8 program.

ORDER - 2

judicial foreclosure proceedings, OALP attempted to renew its HAP
contract with the SHA.  Although the record is not entirely clear, it
does not appear Mr. Delegans disclosed the existence of non-judicial
foreclosure to the SHA.  In any event, the SHA agreed to renew the
contract.  On March 14th, Mr. Delegans signed a new contract on behalf
of OALP.  On March 27th, Steve Cervantes signed on behalf of SHA.

On April 13th, the trustee conducted the trustee's sale.  Pacific
First West, LLC, submitted the highest bid.  The trustee issued a
deed.  Shortly thereafter, BlueRay LLC purchased Pacific First West.
The new owners of the Commercial Building decided not to participate
in the Section 8 housing program.  They notified the SHA, which began
looking for new apartments for the building's Section 8 tenants.  HUD
was aware of the new owners' decision and did not object.

By the end of July, the SHA had arranged for all of the Section 8
tenants to move to new apartments.  HUD provided, and continues to
provide, assistance to those tenants who are eligible.  During
October, two former tenants of the Commercial Building, Stephen Harris
and Garry Campbell, filed an action in state court.  The defendants
removed the matter to federal court based upon the existence of a
federal question.  28 U.S.C. §§ 1441, 1446.  The plaintiffs have
amended their complaint.  As amended, the plaintiffs' complaint names
three defendants.  They are Pacific First West LLC, BlueRay LLC, and
BlueRay Technologies Shareholders, Inc.  The latter is the managing
member of Pacific First West.

The plaintiffs' complaint contains three causes of action.  The
first is based, in part, upon 42 U.S.C. § 1437f(c)(8).  This section

ORDER - 3

is divided upon four parts, *viz.*, (8)(A)-(8)(D).  The first sentence of subsection (8)(A) states, "Not less than one year before termination of any contract under which assistance payments are received under this section, other than a contract for tenant-based assistance under this section, an owner shall provide written notice to the Secretary and the tenants involved of the proposed termination."  42 U.S.C. § 1437f(c)(8)(A).  Congress anticipated an owner might not fulfill his obligations under § 1437f(c)(8)(A):

> In the event the owner does not provide the notice required, the owner may not evict the tenants or increase the tenants' rent payment until such time as the owner has provided the notice and 1 year has elapsed.  The Secretary may allow the owner to renew the terminating contract for a period of time sufficient to give tenants 1 year of advance notice under such terms and conditions as the Secretary may require.

42 U.S.C. § 1437(c)(8)(B).  The plaintiffs allege the defendants violated § 1437f(c)(8)(B) by evicting them from their apartments without providing the one-year notice required by § 1437f(c)(8)(A).

**JURISDICTION**

The defendants raise two jurisdictional issues.  One is whether the plaintiffs have standing to bring an action in federal court.  *See Pershing Park Villas Homeowners Ass'n v. United Pac. Ins. Co.*, 219 F.3d 895, 899 (9th Cir.2000) ("standing concerns whether the plaintiff's personal stake in the lawsuit is sufficient to make out a concrete 'case' or 'controversy' to which the federal judicial power may extend under Article III, § 2").  Another is whether the plaintiffs' amended complaint contains a cause of action that arises under the laws of the United States.  28 U.S.C. § 1331.  The Supreme

ORDER - 4

Court has specified the order in which those issues must be resolved.
The first is whether the plaintiffs have standing. *Steel Co. v.
Citizens for a Better Env't*, 523 U.S. 83, 88-89, 101, 118 S.Ct. 1003,
1009, 1016, 140 L.Ed.2d 210 (1998) (standing is a threshold issue; one
a court must resolve before determining whether the plaintiff has a
cause of action under the Constitution or laws of the United States).
If the plaintiffs have standing, the second issue is whether a federal
question exists. *In re Digimarc Corp. Derivative Litigation*, 549 F.3d
1223, 1229 (9th Cir.2008).

**STANDING**

The jurisdiction of a federal court is limited to actual cases
and controversies. U.S. Const. art. III, § 2, cl. 1. This limitation
is given effect by requiring a litigant to establish standing before
invoking a federal court's authority. *See Allen v. Wright*, 468 U.S.
737, 750-51, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). At its
"irreducible constitutional minimum," standing requires proof of three
things. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct.
2130, 2136, 119 L.Ed.2d 351 (1992) (citations omitted). "First, the
plaintiff must have suffered an 'injury in fact' . . . ." *Id.*
(citations omitted). "Second, there must be a causal connection
between the injury and the conduct complained of -- the injury has to
be 'fairly traceable to the challenged action of the defendant, and
not the result of the independent action of some third party not
before the court.'" *Id.* at 560-61, 112 S.Ct. at 2136 (quoting *Simon
v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 41-42, 96 S.Ct.
1917, 1926, 48 L.Ed.2d 450 (1976)) (internal punctuation omitted).

ORDER - 5

"Third, it must be likely, as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"  *Id.* at 561, 112 S.Ct. at 2136 (quoting *Simon*, 426 U.S. at 38, 43, 96 S.Ct. at 1924, 1926).  The defendants move for summary judgment on the issue of standing.  "In response to a summary judgment motion . . ., a plaintiff can no longer rest on 'mere allegations' but must set forth by affidavit or other admissible evidence 'specific facts' as delineated in Federal Rule of Civil Procedure 56(e) as to the existence of such standing."  *Gerlinger v. Amazon.com Inc., Borders Group, Inc.*, 526 F.3d 1253, 1255-56 (9th Cir.2008) (quoting *Lujan*, 504 U.S. at 561, 112 S.Ct. at 2137).

   A. Injury-in-Fact

   The plaintiffs allege the defendants violated § 1437f(c)(8) by, first, failing to provide notice and, then, by forcing them to vacate their apartments.  The defendants do not deny requiring the plaintiffs to vacate their apartments in the Commercial Building.  Nor do the defendants deny the plaintiffs have suffered inconveniences as a result.  For example, the plaintiffs' new landlords do not provide the services Mr. Delegans did.  They must travel across town to obtain the same services; which can be difficult, at times, because their new apartments are not as close to bus stops as were their former apartments.  Not only that, but also they have lost the psychological support that came from being part of a community of Section 8 tenants in the Commercial Building.  However, according to the defendants, inconvenience is not injury.  They submit the plaintiffs are entitled to one thing under 42 U.S.C. § 1437f; namely, federal housing

ORDER - 6

assistance that enables them to have "a decent place to live."  42

U.S.C. § 1437f(a).  As the defendants point out, the plaintiffs have

never been deprived of apartments or federal housing assistance.  That

being the case, say the defendants, the plaintiffs have not suffered a

cognizable injury.  For their part, the plaintiffs concede the SHA

found them new apartments.  They also concede mere inconvenience is

not an injury in fact.  Nevertheless, they insist there is evidence of

injury that is sufficient to satisfy the first component of Article

III standing.  Mr. Harris has submitted a declaration alleging his new

landlord requires him to pay for the utilities he consumes in his new

apartment.  He claims he did not have to pay for utilities when he

resided in the Commercial Building.

　　"[A]n injury must be a harm that is both concrete and actual or

imminent, not conjectural or hypothetical."  *Fulfillment Services,*

*Inc. v. United Parcel Service, Inc.*, 528 F.3d 614, 618 (9th Cir.2008)

(internal punctuation and citations omitted).  The Ninth Circuit has

not indicated what sorts of circumstances qualify as Article III

injuries in the context of an action arising under 42 U.S.C. §

1437f(c).  Consequently, the defendants have looked elsewhere for

persuasive authority.  They rely heavily upon both *People to End*

*Homelessness, Inc. v. Develco Singles Apts. Assocs.*, 339 F.3d 1 (1st

Cir.2003) ("*PEH*"), and *Baker v. Property Investors of Conn.*, 338

F.Supp.2d 321 (D.Conn.2004).

　　In *PEH*, the owners of apartment buildings notified their Section

8 tenants they did not intent to renew their HAP contracts.  339 F.3d

at 4.  The owners provided notice six weeks before the HAP contracts

expired.  *Id.*  HUD did not object to the owners' decision, and agreed
to issue housing vouchers to the tenants.  *Id.*  A nonprofit
organization filed an action the day before the HAP contracts expired.
*Id.*  The organization alleged the owners violated 42 U.S.C. §
1437f(c)(8) by failing to provide adequate notice.  The organization
alleged HUD violated federal law by permitting the owners to do so.
*Id.*  The district court entered a stipulated restraining order
prohibiting the owners from either evicting a Section 8 tenant or
increasing his rent payment until the one-year period elapsed.  *Id.*
The owners complied with the order.  In time, the district court
dismissed the action.  Insofar as the owners were concerned, the court
ruled the organization lacked standing to sue them.  *Id.*  The First
Circuit agreed.  It concluded the district court had provided all of
the redress to which the organization was entitled by entering the
restraining order.  *Id.* at 9.  No other relief the district court was
authorized to grant would have redressed the organization's remaining
injuries.  Thus, the organization lacked standing.  *Id.*

    The other case upon which the defendants rely heavily is *Baker v.
Property Investors of Conn.*, *supra*.  There, an apartment owner decided
to opt out of the Section 8 program.  Although the owner gave advance
notice of its decision to the tenants as required by 42 U.S.C. §
1437f(c)(8)(A), *Baker*, 338 F.Supp.2d at 324, HUD allegedly violated
that subsection by allowing the owner to terminate the contract 16
days before the one-year period elapsed.  *Id.* at 327.  A group of
tenants filed an action against HUD and others.  *Id.* at 322.  Judge
Alan H. Neveas dismissed the plaintiffs' claims against HUD for want

ORDER - 8

of standing.  *Id.* at 326.  Like the First Circuit before him, he cited the absence of evidence indicating any plaintiff was forced to leave her apartment prior to the expiration of the one-year period.  *Id.* at 327.

This case is distinguishable from *PEH* and *Baker.*  Unlike the plaintiffs in those cases, Messrs. Harris and Campbell have presented evidence the defendants forced them to vacate their apartments without providing the notice allegedly required by § 1437f(c)(8)(A).  Both *PEH* and *Baker* imply those two circumstances constitute an Article III injury when they occur together; and, indeed, that may be the law.  *Cf. Fulfillment Services, Inc.*, 528 F.3d at 618-19 ("The injury required by Article III can exist solely by virtue of statutes creating legal rights, the invasion of which creates standing." (internal punctuation and citations omitted)).  However, the Court need not decide.  Even assuming the plaintiffs have created jury issues with respect to the first two components of Article III standing, they cannot satisfy the third.

B. Redressability

The plaintiffs seek two types of relief based upon the defendants' alleged violation of § 1437f(c)(8)(A).  One is damages; the other is an injunction.  The defendants argue neither type of relief is available.  Consequently, in their opinion, the injury alleged by the plaintiffs is not redressable.

1. Damages

The plaintiffs' request for damages is grounded upon § 1437f(c)(8)(B); the first sentence of which states, "In the event the

ORDER - 9

owner does not provide the notice required [by § 1437f(c)(8)(A)], the owner may not evict the tenants or increase the tenants' rent payment until such time as the owner has provided the notice and 1 year has elapsed."  The preceding language limits a building owner's freedom of action in two ways.  Until he complies with § 1437f(c)(8)(A), he may neither evict his Section 8 tenants nor increase their rent payments.  However, there is nothing in the text of § 1437f(c)(8)(B) or the regulations promulgated thereto requiring him to pay damages.  *See, e.g.*, 24 C.F.R. § 402.8(b) (listing the two tenant protections set forth in the statute).  The absence of a damage clause creates a formidable obstacle for Messrs. Harris and Campbell.  An injury is not redressable if the statute upon which the plaintiff is relying for a remedy does not provide the specific relief he is seeking.  This principle is illustrated by *Steel Co., supra*.  There, an environmental group filed a "private enforcement action under the citizen-suit provision of the Emergency Planning and Community Right-To-Know Act of 1986 (EPCRA), 100 Stat. 1755, 42 U.S.C. § 11046(a)(1)."  523 U.S. at 86, 118 S.Ct. at 1008.  The environmental group alleged a company had failed to file certain "hazardous-chemical inventory and toxic-chemical release forms[.]"  *Id.* at 87, 118 S.Ct. at 1009.  The environmental group sought several types of relief.  One was "'investigation costs.'"  *Id.* at 107, 118 S.Ct. at 1019.  By this, the environmental group meant costs "incurred prior to the litigation, in digging up the emissions and storage information that [the company] should have filed, and that [the group] needed for its own purposes."  *Id.* at 107-08, 118 S.Ct. at 1019.  The environmental group relied upon

a certain section of EPCRA in demanding reimbursement for investigation costs.  The problem was, said the Supreme Court, the section of EPCRA cited by the environmental group did not cover the investigation costs the group was seeking.  *Id.* at 108, 118 S.Ct. at 1019.  Thus, while the environmental group may have been injured by the company's failure to comply with EPCRA, there was no redress for investigation costs under the statute upon which the group relied. *Id.* So, too, here.  Section 1437f(c)(8)(B) does not authorize damages.  Thus, the injuries Messrs. Harris and Campbell have suffered as a result of the defendants' alleged violation of § 1437f(c)(8) are not redressable by means of a judgment ordering the defendants to pay damages.[2]

    *2. Injunction*

    The other form of redress the plaintiffs seek is an injunction.[3] They want persons who resided in the Commercial Building pursuant to the Section 8 program to have the option of reoccupying their apartments until such time as the defendants comply with 42 U.S.C. §

    [2]The plaintiffs do not allege the defendants increased their rent payments in violation of § 1437f(c)(8)(B).  As a result, the Court need not decide whether it has equitable authority to order the defendants to reimburse unlawfully collected rent.  *Cf. In re Digimarc Corp. Derivative Litigation*, 549 F.3d at 1233 (§ 304 of the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7243, expressly requires a wrongdoer to disgorge his "ill-gotten gains").

    [3]The plaintiffs appear to be alleging they are victims of a continuing violation of § 1437f(c)(8).  *Cf. Steel Co.*, 523 U.S. at 108, 118 S.Ct. at 1019 ("If respondent had alleged a continuing violation or the imminence of a future violation, the injunctive relief requested would remedy that alleged harm.").

ORDER - 11

1437f(c)(8)(A).  Like the plaintiffs' request for damages, their

request for an injunction is based upon § 1437f(c)(8)(B).  The

defendants dispute the plaintiffs' reading of subsection (8)(B).  They

claim Section 8 tenants do not have a legal right to reoccupy their

former apartments in the Commercial Building.

     The parties' conflicting interpretations of § 1437f(c)(8)(B)

raise an issue of statutory construction.  The process of construing a

statute begins with its language.  *Greyhound Corporation v. Mt. Hood

Stages, Inc.*, 437 U.S. 322, 330, 98 S.Ct. 2370, 2375, 57 L.Ed.2d 239

(1978); *Ordlock v. Commissioner of Internal Revenue*, 533 F.3d 1136,

1140 (9th Cir.2008).  The first step is to "determine whether the

language at issue has a plain and unambiguous meaning with regard to

the particular dispute in the case."  *Robinson v. Shell Oil Co.*, 519

U.S. 337, 340, 117 S.Ct. 843, 846, 136 L.Ed.2d 808 (1997).  The Court

"'must look to the particular statutory language at issue, as well as

the language and design of the statute as a whole.'"  *McCarthy v.

Bronson*, 500 U.S. 136, 139, 111 S.Ct. 1737, 1740, 114 L.Ed.2d 194

(1991) (quoting *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108

S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988)).

     The defendants acknowledge the first sentence of subsection

(8)(B) states, "In the event the owner does not provide the notice

required, the owner may not evict the tenants or increase the tenants'

rent payment until such time as the owner has provided the notice and

1 year has elapsed."  42 U.S.C. § 1437f(c)(8)(B).  This provision

seems fairly clear.  Among other things, it says a building owner who

fails to comply with § 1437f(c)(8)(A) may not evict a Section 8 tenant

until he rectifies his error.  Arguably, a district court may enter a restraining order protecting a Section 8 tenant from eviction in violation of § 1437f(c)(8)(B).  *See, e.g., PEH*, 339 F.3d at 8-9.

As the defendants point out, subsection (8)(B) contains a second sentence.  "The Secretary may allow the owner to renew the terminating contract for a period of time sufficient to give tenants 1 year of advance notice under such terms and conditions as the Secretary may require."  *Id.*  The defendants argue the subsection's two sentences must be read together, which is true.  *See United States v. Morton*, 467 U.S. 822, 828, 104 S.Ct. 2769, 2773, 81 L.Ed.2d 680 (1984) ("We do not . . . construe statutory phrases in isolation; we read statutes as a whole.").  In the defendants' opinion, the first sentence is conditioned upon the second sentence.  That is to say, tenants are protected from eviction and/or rent-payment increases (first sentence) only if HUD decides to renew the owner's HAP contract (second sentence).  Should HUD decline to do so, say the defendants, the tenants do not have a right to remain in their apartments.[4]

If the defendants' interpretation of § 1437f(c)(8)(B) is correct,

_____

[4]In *PEH*, the First Circuit concluded Congress' determination that HUD "'may allow' the owner to renew [a] . . . HAP contract[] makes it apparent that HUD [i]s not required to renew [a] . . . Section 8 HAP contract[], even in the face of a notice violation."  339 F.3d at 5.  There is no reason to think the Ninth Circuit will reject the First Circuit's interpretation of § 1437f(c)(8)(B).  Thus, the defendants are at least partially correct.  HUD has discretion to determine whether to renew a HAP contract when an apartment owner does not comply with § 1437f(c)(8)(A).

ORDER - 13

one would expect to find language making the first sentence (tenant protections) dependent upon the second sentence (HUD renewal of an expiring HAP contract). However, subsection (8)(B) does not contain any such language. Instead, the two sentences appear together in the same subsection without any indication Congress intended to make the first sentence dependent upon the second. Why would Congress craft subsection (8)(B) in that manner?

Section 1437f(c)(8)(B) is triggered when a building owner terminates a HAP contract without complying with § 1437f(c)(8)(A). The first sentence of § 1437f(c)(8)(B) places a financial burden upon the owner in such situations. Now that he has terminated his HAP contract, he no longer receives HUD-funded rent subsidies for his Section 8 tenants. He might be willing to accept the loss of this revenue if he could replace it by increasing his Section 8 tenants' rent payments or, in the alternative, by evicting them and seeking tenants who are willing to pay higher rent; but he cannot take either of those steps. He must retain his Section 8 tenants and be satisfied with their limited incomes until he complies with § 1437f(c)(8)(A). Faced with this financial reality, he may reconsider his decision to terminate the HAP contract. If he's willing to do so, HUD has authority to help him. HUD may renew the HAP contract "for a period of time sufficient to give tenants 1 year of advance notice[.]"

The structure of § 1437f(c)(8)(B) suggests Congress intended to enforce § 1437f(c)(8)(A) by means of a stick-and-carrot technique. The first sentence of subsection (8)(B) is the stick. An owner who terminates a HAP contract without providing the notice required by §

1437f(c)(8)(A) may not evict his Section 8 tenants or increase their

rent payments.  The second sentence is the carrot.  An owner who

reconsiders his decision to terminate a HAP contract may obtain rent

subsidies from HUD until such time as he provides the notice to which

his Section 8 tenants are entitled.

The defendants disagree with the assertion Congress enacted §

1437f(c)(8)(B) in order to ensure Section 8 tenants receive the notice

required by § 1437f(c)(8)(A).  The defendants submit the purpose of §

1437f(c)(8), in general, and subsection (8)(B), in particular, is to

ensure Section 8 tenants receive federal housing assistance in the

event a building owner terminates a HAP contract.  In the defendants'

opinion, it is up to HUD to decide what type of assistance to provide.

If HUD decides to renew the HAP contract, the owner must abide by the

limitations that are set forth in the first sentence of subsection

(8)(B).  Otherwise, the owner is free to do as he pleases.  Put

somewhat differently, the tenant protections established by the first

sentence apply only if two contingencies occur:  HUD offers to renew

the now-expired HAP contract, and the owner accepts.  If HUD decides

not to make an offer, or if the owner rejects HUD's offer, the

protections are inapplicable.

The defendants' interpretation of § 1437f(c)(8)(B) would

transform the statute by eliminating the stick.  On their reading, an

owner who fails to comply with § 1437f(c)(8)(A) would be under no

financial pressure to ask HUD to extend the HAP contract until he

provides notice.  Instead, it would be up to HUD to contact the owner

and attempt to persuade him to accept an offer of renewal.  (And what

financial incentive would an owner have to accept an offer from HUD? In all probability, he would make more money by rejecting HUD's offer, evicting his Section 8 tenants, and renting his apartments to persons who are willing to pay more.)

There is nothing in the structure of subsection (8)(B) indicating Congress intended the statute to operate in the manner proposed by the defendants. To the contrary, it is likely Congress said what it meant and meant what it said. "In the event the owner does not provide the notice required [by § 1437f(c)(8)(A)], the owner may not evict the tenants or increase the tenants' rent payment until such time as the owner has provided the notice and 1 year has elapsed." 42 U.S.C. § 1437f(c)(8)(B). Granted, a noncompliant owner may seek financial relief from HUD. "The Secretary may allow the owner to renew the terminating contract for a period of time sufficient to give tenants 1 year of advance notice under such terms and conditions as the Secretary may require." *Id.* Nevertheless, whether or not HUD renews the HAP contact, a noncompliant owner may not deprive his Section 8 tenants of the protections set forth in § 1437f(c)(8)(B).

The plaintiffs argue a district court may enforce the above-quoted tenant protections by issuing an injunction ordering a noncompliant building owner to allow wrongfully evicted Section 8 tenants to reoccupy their former apartments. The plaintiffs may be correct. *Cf. PEH*, 339 F.3d at 8-9 (assuming, without deciding, a district court had authority to issue a restraining order). Nevertheless, in this case, injunctive relief will not remedy the plaintiffs' alleged injuries. To begin with, an injunction may be

ORDER - 16

futile.  As they conceded during oral argument, the Commercial Building has been substantially remodeled; their former apartments no longer exist in the same state they did when they left.  *Cf. In re Estate of Ferdinand Marcos Human Rights Litig.*, 94 F.3d 539, 545 (9th Cir.1996) (a "court should not issue an unenforceable injunction").  The Court need not address the issue of futility at this time because the defendants have not raised it.  However, the defendants have raised an equally important issue.  Neither plaintiff seeks to return to the Commercial Building.  During Mr. Harris' deposition, the following exchange took place:

> Q. If you're successful in this lawsuit, if the judge rules in your favor, are you going to move back into the Commercial Building?
> A. No, sir.

(Deposition of Stephen J. Harris on July 17, 2009, at 47.)  A similar exchange took place during Mr. Campbell's deposition:

> Q. [W]hat do you want the court to do should you prevail in this lawsuit?
> A. I'd like the court to understand . . . I need to get my $100 deposit back, and understand that it is just not right to go into somebody's house and given them 30 days to move out.  . . .
> . . . .
> Q. So I just want to make sure I've got your full answer. So you've said you want the court to award you a hundred dollars, and tell everybody that it was wrong for you to get a 30-day notice.  Is there anything else you want the court to do for you?
> A. Well, the 30-day notice isn't what's wrong.  What's wrong is evicting low income people that have no place else to go.
> . . .

ORDER – 17

(Deposition of Garry W. Campbell on June 30, 2009, at 37, 38.[5])   In view of the plaintiffs' answers during their depositions, it is clear neither man wants to reside in his former apartment.   How, then, would either one benefit from an injunction?   Perhaps he would derive "psychic satisfaction" from seeing "that a wrongdoer gets his just deserts[] or that the Nation's laws are faithfully enforced[,]" *Steel Co.*, 523 U.S. at 107, 118 S.Ct. at 1019; but satisfaction of that sort "is not an acceptable Article III remedy[.]"   *Id.*   In fact, an injunction is worthless to the plaintiffs as neither man wants to return to the Commercial Building; assuming, of course, his former apartment exists.   Thus, the plaintiffs' alleged injuries will not be redressed by an injunction.   *See Steel Co.*, 523 U.S. at 107, 118 S.Ct. at 1019 ("Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement.").

C. Conclusion Regarding Standing

The first two components of Article III standing are injury-in-fact and causation.   *See Steel Co.*, 523 U.S. at 102-03, 118 S.Ct. at 1016-1017.   The plaintiffs have presented evidence indicating the defendants forced them to vacate their apartments in the Commercial Building without providing the notice § 1437f(c)(8)(A) requires.   The Court assumes, without deciding, genuine issues of material fact exist with respect to the first two components of Article III standing.   The

[5]Copies of the relevant pages of the Harris and Campbell depositions are attached to the "Declaration of Steven Schneider."   This declaration is court record number 167.

third component is redressability.  *See Steel Co.*, 523 U.S. at 102-03, 118 S.Ct. at 1016-1017.  The plaintiffs request two things under § 1437f(c)(8)(B):  damages and an injunction.  They are not entitled to damages, and they forthrightly acknowledge they do not seek to return to their apartments.  As a result, they will gain nothing tangible from an injunction other than, perhaps, some "psychic satisfaction" from having the Court declare the defendants violated § 1437f(c)(8).  Since none of the relief the plaintiffs request pursuant to § 1437f(c)(8)(B) will remedy their alleged injuries, they cannot establish redressability.  It follows they lack standing to maintain an action under 42 U.S.C. § 1437f(c)(8).  The Court must dismiss their first and second causes of action to the extent they depend upon that statute.

**STATE LAW CLAIMS**

All three of the plaintiffs' causes of action are based, in part, upon the law of the State of Washington.  The Court may exercise supplemental jurisdiction over the plaintiffs' state claims if they are so related to the plaintiffs' federal claim "they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  However, the Court is not obligated to exercise supplemental jurisdiction.  *Acri v. Varian Associates, Inc.*, 114 F.3d 999, 1000-01 (9th Cir.1997) (en banc).  In determining whether to retain or decline jurisdiction, the Court has considered the four factors listed in 28 U.S.C. § 1367(c):

> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

Furthermore, at oral argument, the Court asked the parties whether it should exercise supplemental jurisdiction if it dismissed the plaintiffs' federal claim.  Both sides agreed the Court should remand the plaintiffs' state claims to state court in that event.  Given the parties' joint request, and given the factors set forth in § 1367(c), the Court declines to exercise supplemental jurisdiction over the plaintiffs' state claims.

**IT IS HEREBY ORDERED:**

1. The plaintiffs' motion for partial summary judgment (**Ct. Rec. 66**) is **denied.**

2. The defendants' motion for partial summary judgment (**Ct. Rec. 77**) is **denied.**

3. The defendants' motion to qualify Steve Cervantes as an expert witness under Federal Rule of Evidence 702 (**Ct. 82**) is **denied.**

4. The defendants' motion to strike (**Ct. Rec. 98**) is **denied.**

5. The defendants' motion for summary judgment on the plaintiffs' first and second causes of action (**Ct. Rec. 101**) is **granted in part.** The plaintiffs' first and second causes of action are dismissed to the extent they are based upon 42 U.S.C. § 1437f(c)(8).

6. The plaintiffs' motion to compel discovery (**Ct. Rec. 123**) is **denied.**

7. The plaintiffs' motion for summary judgment (**Ct. Rec. 130**) is denied.

ORDER - 20

8. The plaintiffs' motion for summary judgment (**Ct. Rec. 131**) is **denied.**

9. The defendants' motion to dismiss (**Ct. Rec. 158**) is **denied.**

10. The defendants' motion to expedite (**Ct. Rec. 162**) is **denied.**

11. The defendants' motion for leave to file a third-party complaint and for an order bifurcating trial (**Ct. Rec. 164**) is **denied.**

12. The plaintiffs' state claims are remanded to state court.

**IT IS SO ORDERED.**  The District Court Executive is hereby directed to file this order, enter judgment accordingly, furnish copies to counsel, and close the case.

**DATED** this   23rd   day of October, 2009.

                    s/Fred Van Sickle
                   Fred Van Sickle
        Senior United States District Judge

ORDER - 21